UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

For Online Publication Only

-----------------------------------------------------------------X
THE MONEY SOURCE, INC.,

                    Plaintiff,

**MEMORANDUM & ORDER**
22-cv-5204 (JMA) (SIL)

      -against-

**FILED**
**CLERK**

5/19/2025 11:23 am

AMERICAN KEN, INC.,

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

                    Defendant.
-----------------------------------------------------------------X

**AZRACK, United States District Judge:**

      Presently before the Court is the unopposed motion by Plaintiff The Money Source, Inc. ("Plaintiff" or "TMS"), for summary judgment for breach of contract and indemnification[1] pursuant to Federal Rule of Civil Procedure ("Rule") 56. (ECF No. 41.) Plaintiff's claims stem from a loan purchase agreement executed between TMS and Defendant American Ken, Inc., and Defendant's subsequent breach of contract and failure to indemnify pursuant to the terms of the agreement. (See Am. Compl., ECF No. 7.)

      For the reasons set forth below, Plaintiff's motion for summary judgment is GRANTED and this action is CLOSED.

---

[1] Although Plaintiff's Amended Complaint states six causes of action, Plaintiff here only "seeks summary judgment with respect to only two of the six claims, [as] Plaintiff is confident that resolution of these two causes of action will sufficiently resolve the case in full." (ECF No. 41 at 4 n.1.) The Court therefore only addresses First Cause of Action for Breach of Contract and Third Cause of Action for Indemnification.

## I.     BACKGROUND[2]

### A. Factual Background[3]

#### 1. The Purchase Agreement

On or about, October 15, 2019, Defendant American Ken was approved to submit certain mortgage loans to TMS for review and purchase though the TMS Correspondent Seller's Program (the "TMS Correspondent Program"). (Pl's 56.1 ¶ 1.) In connection with the approval of American Ken as a TMS correspondent lender, on October 15, 2019, TMS and American Ken executed the Purchase Agreement. (Id. ¶ 2.) The Purchase Agreement sets forth the terms and conditions governing the parties' correspondent lending relationship, and the TMS Correspondent Seller's Manual ("Correspondent Manual") sets forth the terms and conditions of the TMS Correspondent Program. (Id. ¶¶ 3-4.) The Purchase Agreement incorporates by reference the Correspondent Manual. (Id. ¶ 5.) With respect to the loans at issue in this action, the Purchase Agreement is the "operative document." (Id. ¶ 7.)

The Purchase Agreement applies only to "eligible" loans. (Id. ¶ 8.) For a loan to be eligible for purchase under the Purchase Agreement, the loan must, among other things, be in full compliance with the standards set forth in the "Underwriting Guidelines" and "Mortgage Products" sections of the Correspondent Manual. (Id. ¶ 9.) To be in full compliance with the standards set forth in the "Underwriting Guidelines" and "Mortgage Products" sections of the

---

[2]   The facts set forth in this Opinion are drawn from Plaintiff's Amended Complaint (ECF No. 7 ("Am. Compl.")) and Plaintiff's submissions in connection with its motion for summary judgment. The Court draws from Plaintiff's Local Civil Rule 56.1 Statement of Material Undisputed Facts (ECF No. 41-2 ("Pl.'s' 56.1")), the Affidavit of Joseph M. Labuda, counsel for Plaintiff (ECF No. 41-3 ("Labuda Aff."); and the Affidavit of Anasha Persaud, compliance officer for TMS (ECF No. 41-13 ("Persaud Aff.") Citations to Plaintiff's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein. For ease of reference, the Court refers to Plaintiff's brief in support of their motion for summary judgment as "Pl.'s Br." (ECF No. 43.)

[3]   Because Defendant has failed to oppose the instant motion for summary judgment, "plaintiff's recitation of the facts is assumed to be true." Freedom Mortgage Corporation v. Stephen C. Barone, et al., No. 18CV1839, 2022 WL 267876, at *3 (E.D.N.Y. Jan. 28, 2022). Even in the context of an unopposed motion, however, the Court "must be satisfied that the citation to evidence in the record supports the assertion." Gachette v. Metro N.-High Bridge, 598 F. App'x 803, 804 (2d Cir. 2015) (quoting Teddy Bear Co. v. 1-800 BEARGRAM Co., 373 F.3d 241, 246 (2d Cir. 2004)).

Correspondent Manual, among other things, a loan must be in full compliance with the standards and guidelines of the applicable insuring agency – in this case, the Federal National Mortgage Association ("Fannie Mae" or "FNMA.") (Id. ¶ 10.) For a loan to be compliant with Fannie Mae's standards and guidelines, among other things, the loan's application must disclose any and all liabilities of the mortgagee and must not contain any material misrepresentations, including, but not limited to, misrepresentations of the mortgagee or guarantor's income/employment, occupancy, or primary residence. (Id. ¶ 11.) The responsibility for ensuring that the loans American Ken submits to TMS are fully compliant with Fannie Mae's standards and guidelines, rests with American Ken. (Id. ¶ 12.)

Pursuant to the terms of the Purchase Agreement, American Ken represented and warranted that each loan it submits to TMS is "valid and complies with all criteria contained in the [Correspondent Seller's] Manual." (Id. ¶ 13.) Under §7(A)(19) of the Purchase Agreement, American Ken represented and warranted that:

> (i) All other representations as to each . . . Loan are true and correct and meet the requirements and specifications of all parts of [the Purchase] Agreement and the [Correspondent Seller's] Manual.
> (ii) No fraud, error, omission, misrepresentation, negligence, or similar occurrence with respect to the Loan has taken place on the part of [American Ken], or any other party (including without limitation the mortgagor . . .) involved in the origination or sale of the Loan.
> (iii) The documents, instruments, and agreements submitted for loan underwriting were not false and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading.
> (iv) [American Ken] has reviewed all of the documents constituting the loan file and the credit file and has made such inquiries as it deems necessary to make and confirm the accuracy of the statements made therein.

Labuda Aff., Ex. A, §7(A)(19). Additionally, American Ken represented and warranted that any breach of the representations and warranties set forth in §7(A)(19) "shall be deemed to materially and adversely affect the value of the Loan and shall require an immediate repurchase of the affected Loan." (Id.)

3

Furthermore, American Ken agreed, pursuant to the terms of the Purchase Agreement, that any one or more of the following circumstances gives rise to American Ken's obligation to repurchase a particular loan from TMS:

> (i) TMS determines that there is any evidence of fraud in the origination of the Loan or in the sale of the Loan to TMS, or that any information or documentation in the Loan file is not true or correct, or if material information was not disclosed in the Loan file. (*See* Labuda Aff., Ex. "A", §8(A)(2), at TMS_464; *see also* Jan. 24 American Ken Tr. 52:3-8, 14-25, 53:1-6)(emphasis added);
> (ii) TMS has sold such Loan in whole or in part to [an Agency], and [that Agency] requests TMS to repurchase said interest or reimburse it for losses . . .provided the reason for such ineligibility [or] repurchase . . . shall be due to a failure of the Loan to meet requirements specified in the [Correspondent Seller's] Manual at the time of TMS's purchase of the loan from Seller. (*See* Labuda Aff., Ex. "A", §8(A)(3), at TMS_464; *see also* Jan. 24 American Ken Tr. 53:7-24)(emphasis added); and/or
> (iii) Seller fails to observe or perform, or breaches any of the representations, warranties, or agreements in [the Purchase] Agreement or the [Correspondent Seller's] Manual with respect to a particular Loan.

Labuda Aff., Ex. "A", §8(A)(5)). Pursuant to the Purchase Agreement, TMS is required to notify American Ken of that obligation, in writing, and set forth the circumstances that gave rise to the obligation. (Id.) Upon receipt of a notice to repurchase, American Ken typically has thirty days to repurchase the subject loan. (Id. §8(B)(2).) Repurchases are required to be made within the requisite timeframe (typically 30 days), "without exception." (Id. §8(B)(3).) However, if American Ken makes a written request for an extension of time to repurchase, TMS could grant such extension in its "sole and absolute discretion." (Id.) If American Ken fails to repurchase any loan within the requisite timeframe, TMS, in its sole discretion, has the right to offset its losses by selling the default loan as "scratch and dent.[4]" (Id. §8(B)(4).) Under the Purchase Agreement,

---

[4] A "scratch and dent" is a classification for first lien mortgage loans originated by a seller that have some form of defect in their underwriting or collateral, such as those which do not meet the required program criteria or guidelines for any government or other takeout investor, or the performance expectations for the loan, including but not limited to issues such as missing documentation, unusual loan terms, poor payment history, compliance issues, or first-payment defaults. Nonetheless, at some point after closing, a defect in the loan was subsequently discovered, meaning the loan does not meet the guideline requirements for the program it was closed with, and as a result, loans of this type can be sold on a secondary market as "scratch and dent" which represents this classification. (Id. n.3)

4

American Ken has no contractual right to appeal a repurchase demand. (Pl's 56.1 ¶ 22.)

Pursuant to the terms of the Purchase Agreement, the repurchase price of a loan which has not been sold as scratch and dent is equal to: (i) the then unpaid principal balance ("UPB"); plus (ii) the Premium Purchase Price ("PPP"); plus (iii) interest. (See Labuda Aff., Ex. A, §9(A)(1), §9(A)(4).) The repurchase price of a loan which has been sold by TMS as scratch and dent is equal to: (i) the UPB at the time of scratch and dent sale; plus (ii) the PPP; minus (iii) compensation received via the scratch and dent sale. (See id.) A PPP is equal to the markup for the origination and underwriting of a loan that a correspondent lender charges to TMS at the time of sale of that loan to TMS. (Id.) Under the Purchase Agreement, American Ken is obligated to indemnify TMS for:

> (i) "all suits, costs, damages, losses, fees, or claims, including without limitation reasonable attorney's fees" incurred by TMS to the extent that such all suits, costs, damages, losses, fees, claims, and attorney's fees "aris[e] out of or in connection with any negligence, fraud, or a material omission on the part of [American Ken] in receiving, processing, or funding any loan [sold to TMS under the Purchase Agreement];
> (ii) "all suits, costs, damages, fees or claims, including without limitation reasonable attorneys' fees (both in-house and outside counsel)," incurred by TMS to the extent that such all suits, costs, damages, fees, claims, and attorney's fees "aris[e] out of or in connection with any breach of [American Ken's repurchase obligation]; and
> (iii) "all losses" to the extent such losses "aris[e] out of or in any way related to [American Ken'] breach of any representation and warranty [set forth in the Purchase Agreement]."

(Pl's 56.1¶ 26; Labuda Aff., Ex. A, §10(A)-(C).) American Ken's indemnification obligations to TMS under the Purchase Agreement are deemed to survive "any sale or assignment of any Loan by TMS to any third party" and any suspension or termination of the Purchase Agreement. (Labuda Aff., Ex. A, §10(D).)

Under the terms of the Purchase Agreement, where either party brings suit as the result of any alleged breach of the Purchase Agreement, the prevailing party that obtains a final award "shall be entitled to receive from the non-prevailing party reasonable attorney's fees incurred by reason

5

of such action and all costs of . . . litigation and preparation thereof." (See Labuda Aff., Ex. A, §19. Additionally, TMS retains the right to suspend or terminate the Purchase Agreement where TMS "believes in good faith" that American Ken has breached any of its warranties and representations or has breached a repurchase obligation. (See Labuda Aff., Ex. A, §14.)

### 2. Termination of the Purchase Agreement

On June 15, 2022, TMS provided American Ken written notification that it was terminating the Purchase Agreement, effective immediately. (Pl's 56.1 ¶ 30.) As set forth in the Termination Letter, TMS's decision to terminate was based, in large part, on a pattern of "loans [sold to TMS by American Ken] being identified as not meeting [Fannie Mae] terms and requirements . . . including but not limited to specified income misrepresentations," which had resulted in multiple repurchase demands being issued to American Ken, at least five of which were outstanding at the time of termination, and four of which to date continue to be outstanding– Loan Nos.: 5409954, 5418746, 5414779, and 5417008. (Id. ¶ 31.) In response to the Termination Letter, on June 29, 2022, American Ken provided the following assurances in writing to TMS:

> (i) For the outstanding demands on the mentioned files, we are working to purchase these loans off your books;
>
> (ii) Please rest assured that we will do everything necessary to clear these loans from TMS and to fulfill our agreement with you. All I ask is that you continue to be patient with me as to the time since I am reselling the loans scratch and dent to other investors; and
>
> (iii) In no way shape or form will we not be responsive to TMS requests.

(Id. ¶ 32.) In addition, with respect to two of the Loans that were outstanding at the time of termination, American Ken acknowledged, in writing, that it was liable for the repurchase of each Loan, and even provided TMS with a date certain for the repurchase of each. Specifically:

> (i) With respect to Loan 5418746, on June 29, 2022, American Ken informed TMS, in writing, that "[t]his [L]oan will be purchased back by July 10th." However, the Loan was not repurchased by July 10th. Then, on July 12, 2022, American Ken reassured TMS, in writing, that "this repurchase will be completed shortly I'm on

6

top of it."

(ii) With respect to Loan 5409954, on June 29, 2022, American Ken conceded that the borrower's income was misrepresented in the Loan application, writing that "[i]t appears that, the borrower along with the owner of the Mirage Venue (Greg Galajian) misrepresented the income." American Ken then stated that Loan 5409954 "is in the process of being purchased by our investor by July 15th."

(Id. ¶ 33.) In addition to terminating the Purchase Agreement, the Termination Letter informed American Ken that:

in accordance with ongoing QC reviews by TMS and in direct part due to [the multiple then outstanding] demands, TMS has performed and will continue to perform QC audits on ALL loans American Ken has sold to TMS in advance of this termination as an approved lender with us. At present, it is important to note that TMS has uncovered additional issues through its reviews and has legitimate concerns about other misrepresentations and fraudulent information contained within the documents of several other loans delivered to us from American Ken. Therefore, it is expected that additional demands from [Fannie Mae] will follow with respect to the loans TMS purchased from American Ken.

(Id. ¶ 34.) On September 19, 2022, Fannie Mae notified TMS that it had identified ten additional American Ken loans that were ineligible due to material misrepresentations and/or undisclosed liabilities, and demanded the repurchase of those ten loans. (Id. ¶ 35.) In turn, on September 22, 2024, TMS notified American Ken in writing that each of the ten loans had been deemed ineligible, provided the circumstances giving rise to each determination of ineligibility, and demanded the repurchase of each loan. (Id. ¶ 36.) Plaintiff identifies 14 loans in total that American Ken has failed to repurchase or indemnify TMS for its losses, in violation of its contractual obligations: Loan 5409954; Loan 5418746; Loan 5414779; Loan 5417008; Loan 5414796; Loan 5415703; Loan 5416232; Loan 5416795; Loan 5417006; Loan 5417084; Loan 5417780; Loan 5417868; Loan 5417908; and Loan 5418241. (Id. ¶ 37.)

### 3. Damages

With respect to these 14 loans, TMS has offset it losses as to the following 12 Loans via scratch and dent sales: Loans 5418746; 5417008; 5416795; 5414796; 5415703; 5416232;

7

5417780; 5417084; 5418241; 5417006; 5417868; and 5417908. (Id. ¶ 38.) However, American Ken has failed to indemnify TMS for its losses with respect to the Loans sold as scratch and dents, and as a result, TMS claims that it has suffered damages totaling $2,144,990.25. (Id. ¶ 39.)

To date, with respect to the two Loans that American Ken has not sold as scratch and dent, i.e., Loan Nos. 5409954 and 5414779, because of American Ken's failure to repurchase these Loans, TMS claims that it has suffered damages totaling $889,076.45. (Id. ¶ 40.) TMS also claims that it is also entitled to the payment of its attorneys' fees and costs incurred in this action, and as of August 2, 2024, TMS's fees and costs total $122,472.80. (Id. ¶ 42.)

### B. Procedural History

On August 31, 2022, Plaintiff filed its Complaint, alleging causes of action for breach of contract, unjust enrichment, indemnification, specific performance, breach of warranty, and contractual legal fees and costs. (See Compl., ECF No. 1.) On September 1, 2022, Plaintiff Amended its Complaint, which contains the same six causes of action. (See Am. Compl., ECF No. 7.) The parties engaged in discovery, and on March 29, 2024, Plaintiff requested a pre-motion conference to move for summary judgment. (ECF No. 33.) The Court waived its pre-motion conference requirement and ordered a briefing schedule. (See April 23, 2024 Order; May 2, 2024 Order.) On October 1, 2024, Plaintiff filed its fully briefed motion for summary judgment. (ECF No. 41.) Additionally, Plaintiff filed a letter stating that "American Ken notified the undersigned that 'no opposition to the summary judgment will be filed' and that [Plaintiff] 'may advise the court accordingly.'" (ECF No. 42) (quoting an email from Vik Pawar, lead counsel for Defendant.)

## II.   LEGAL STANDARDS

### A. Summary Judgment Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

8

56(a). The movant bears the burden of demonstrating that "no genuine issue of material fact exists." Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "When ruling on a summary judgment motion, [the court] must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Dallas Aerospace, Inc., 352 F.3d at 780.

The standard of review is the same where, as here, the motion for summary judgment is unopposed. Rolkiewicz v. City of New York, 442 F. Supp. 3d 627, 637 (S.D.N.Y. 2020). When the adverse party does not respond to a motion for summary judgment, "summary judgment, if appropriate, shall be entered against the adverse party." Id.; see also United States Liab. Ins. Co. v. P. Mahoney Contracting Corp., 1998 U.S. Dist. LEXIS 19858, at *3 (S.D.N.Y. December 21, 1998) (even when summary judgment motion is unopposed, "judgment should not be granted in circumstances contrary to law"). "In an unopposed motion for summary judgment, plaintiff's recitation of the facts is assumed to be true." Freedom Mortgage Corporation, 2022 WL 267876, at *3 (citing Mason Tenders Dist. Council Welfare Fund v. Asturias, Inc., 2003 U.S. Dist. LEXIS 1003, at *3 (D.N.Y., January 23, 2003)). Pursuant to Local Rule 56.1(c), in a motion for summary judgment, "[a]ll material facts set forth in the statement [of material facts annexed to the motion] required to be served by the moving party will be deemed to be admitted unless controverted by the statement [included with the opposition to the motion] required to be served by the opposing party." Local Rule 56.1(c).

9

A non-response, however, is not a default. Jackson v. Fed. Express, 766 F.3d 189, 194 (2d Cir. 2014). Instead, "[b]efore summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed." Id. "Even unopposed motions for summary judgment must 'fail where the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law.'" D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006) (quoting Vt. Teddy Bear Co. v. 1–800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004) ("Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law.")); Charter Oak Fire Ins. Co. v. Fleet Bldg. Maint., Inc., 707 F. Supp. 2d 329, 333 (E.D.N.Y. 2009) ("[W]hen a nonmoving party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial . . .") (citing Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 2001)). "And, of course, the court must determine whether the legal theory of the motion is sound." Jackson, 766 F.3d at 194.

### III.  DISCUSSION

As stated above, Plaintiff moves for summary judgment only on its First Cause of Action for Breach of Contract and Third Cause of Action for Indemnification. The Court addresses each cause of action in turn.

### A. Plaintiff is Entitled to Summary Judgment on its Breach of Contract Claim

As a preliminary matter, pursuant to the Purchase Agreement, the contract is enforced pursuant to New York law. (See Pl's 56.1 ¶ 1 n.1); see also AEI Life LLC v. Lincoln Benefit Life Co., 892 F.3d 126, 132 (2d Cir. 2018) ("Under New York law, 'courts will generally enforce choice-

of-law clauses,' because 'contracts should be interpreted so as to effectuate the parties' intent.'" (quoting Ministers & Missionaries Benefit Bd. v. Snow, 26 N.Y.3d 466, 470, 45 N.E.3d 917, 919, 25 N.Y.S.3d 21, 23 (2015)). "'The elements of a breach of contract claim under New York law are: (1) the existence of a contract; (2) due performance of the contract by the plaintiff; (3) breach of contract by the defendant; and[ ] (4) damages resulting from the breach.'" Fersel v. Paramount Med. Servs., P.C., 588 F. Supp. 3d 304, 314–15 (E.D.N.Y. 2022) (quoting Marks v. New York Univ., 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999) (citation and quotation marks omitted). Under New York law, a court interpreting a contract is "to give effect to the intent of the parties as revealed by the language they chose to use." Bolt Elec., Inc. v. City of New York, 223 F.3d 146, 150 (2d Cir. 2000).

Here, there is no genuine dispute of material fact that all four elements of the breach of contract claim are met. TMS demonstrates the existence of a contract in the form of the Purchase Agreement. (Pl's 56.1 ¶¶ 2, 6). With respect to the 14 loans at issue, there is no dispute that the Purchase Agreement is the operative document. (Id. ¶ 7.) Therefore, Plaintiff satisfies the first element of its breach of contract claim.

TMS also establishes that it duly performed under the Purchase Agreement. TMS took possession of each Loan in exchange for the UPB, plus the PPP charged by American Ken. (Pl's 56.1 ¶ 37(i)-(xiv).) Additionally, Plaintiff fulfilled its contractual obligations by providing American Ken with notice of its repurchase obligation upon the determination of ineligibility of each loan. (Id.) Thus, Plaintiff duly performed pursuant to the Purchase Agreement.

Next, Plaintiff demonstrates that Defendant breached its obligations under the Purchase Agreement. Pursuant to the Purchase Agreement, upon receipt of the written notice of repurchase obligation for each of the 14 loans, Defendant became obligated to repurchase each respective loan within 30 days. (Labuda Aff., Ex. "A", §8(B)(2).) American Ken failed to repurchase any of the

11

14 loans. (Pl's 56.1 ¶ 36(i)-(xiv)). Thus, Plaintiff demonstrates that Defendant breached the Purchase Agreement.

Finally, Plaintiff establishes that it suffered damages from American Ken's failure to repurchase the 14 loans at issue. Plaintiff demonstrates that it sold 12 of the loans "scratch and dent," and that it was unable to sell the remaining two loans. (Id. ¶¶ 39-42.) Thus, Plaintiff establishes that it suffered damages because of Defendant's failure to repurchase the loans and establishes its breach of contract claim under New York law. [5]

### B. Plaintiff is Entitled to Summary Judgment on its Claim for Contractual Indemnification

Plaintiff asserts that it is entitled to summary judgment on its Third Cause of Action for Indemnification for "costs and legal fees" arising from this litigation pursuant to the specific language of the Purchase Agreement. (Pl's Br. 12-13.) Section 10 of the Purchase Agreement contains an indemnity clause that obligates Defendant to indemnify Plaintiff for:

> (i) all suits, costs, damages, losses, fees, or claims, including without limitation reasonable attorney's fees" incurred by TMS to the extent that such all suits, costs, damages, losses, fees, claims, and attorney's fees aris[e] out of or in connection with any negligence, fraud, or a material omission on the part of [American Ken] in receiving, processing, or funding any loan [sold to TMS under the Purchase Agreement];
> (ii) all suits, costs, damages, fees or claims, including without limitation reasonable attorneys' fees (both in-house and outside counsel), incurred by TMS to the extent that such all suits, costs, damages, fees, claims, and attorney's fees aris[e] out of or in connection with any breach of [American Ken's repurchase obligation]; and
> (iii) all losses to the extent such losses aris[e] out of or in any way related to[American Ken'] breach of any representation and warranty [set forth in the Purchase Agreement].

(Pl's 56.1 ¶ 26; Labuda Aff., Ex. A, §10(A)-(C).)

---

[5] The Court notes here that in Defendant's answer to the Amended Complaint, it asserted 21 separate affirmative defenses and reserved its rights to provide further "undiscovered affirmative defenses." (See generally, ECF No 12.) However, "[g]iven Defendants' failure to oppose Plaintiff's motion for summary judgment, it is unnecessary to address any of [American Ken's] affirmative defenses." Freedom Mortgage Corporation, 2022 WL 267876, at *4 (E.D.N.Y. Jan. 28, 2022) (citing 1st Bridge LLC v. William Lee Freeman Garden Apts. LLC, No. 10-CV-3191, 2011 WL 2020568, at *1 (S.D.N.Y. May 23, 2011)).

"Because promises in a contract to indemnify the other party's attorney's fees and related costs 'run against the grain of the accepted policy that parties are responsible for their own attorneys' fees,'" courts applying New York law do not infer a party's intention to indemnify such costs "unless the intention to do so is unmistakably clear from the language of the promise." Homeward Residential, Inc. v. Sand Canyon Corp., 298 F.R.D. 116, 132 (S.D.N.Y. 2014) (quoting Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 199 (2d Cir. 2003)); Hooper Assocs., Ltd. v. AGS Computers, Inc., 74 N.Y.2d 487, 492, 549 N.Y.S.2d 365, 548 N.E.2d 903 (1989) (internal citations omitted.) Here, the Court finds that the language of the contract is unmistakably clear. American Ken is obligated to indemnify Plaintiff for any costs and reasonable attorney's fees. Thus, Plaintiff is entitled to summary judgment on its Third Cause of Action for Indemnification.

### C. Damages

Plaintiff requests a total damages award of $3,034,066.70 with respect to Defendant's failure to satisfy its repurchase obligation pursuant to the 14 loans at issue. (See Pl's Br. at 10 - 11.) Regarding the 10 loans Plaintiff was able to sell "scratch and dent," Plaintiff adequately establishes damages of $2,144,990.25, as follows:

| LOAN NO. | UPB AT SALE | COMPENSATION RECEIVED | PREMIUM PURCHASE PRICE | TOTAL DAMAGES |
|---|---|---|---|---|
| 5418746 | $ 393,867.86 | $ (235,910.44) | $ 14,686.04 | $ 172,643.46 |
| 5417008 | $ 776,919.53 | $ (505,936.47) | $ 15,483.33 | $ 286,466.39 |
| 5416795 | $ 451,505.63 | $ (294,024.23) | $ 22,041.43 | $ 179,522.83 |
| 5414796 | $ 334,851.63 | $ (217,988.41) | $ 8,487.36 | $ 125,330.58 |
| 5415703 | $ 400,601.53 | $ (260,858.36) | $ 15,785.82 | $ 155,528.99 |
| 5416232 | $ 332,072.11 | $ (199,243.27) | $ 15,676.98 | $ 148,505.82 |
| 5417780 | $ 641,417.73 | $ (384,075.56) | $ 8,757.98 | $ 266,100.15 |
| 5417084 | $ 700,995.87 | $ (419,896.48) | $ 7,796.82 | $ 288,896.21 |
| 5418241 | $ 383,939.60 | $ (230,363.76) | $ 2,865.28 | $ 156,441.12 |
| 5417006 | $ 357,837.61 | $ (232,017.93) | $ 12,028.78 | $ 137,848.46 |
| 5417868 | $ 358,764.80 | $ (233,675.47) | $ 18,894.44 | $ 143,983.70 |
| 5417908 | $ 213,983.71 | $ (139,347.98) | $ 9,086.81 | $ 83,722.54 |

(Pl's 56.1 ¶ 39.) Additionally, Plaintiff was unable to sell Loan Nos. 5409954 and 5414779, and as a result, adequately establishes damages as follows:

| LOAN NO. | CURRENT UPB | PURCHASE PRICE PREMIUM | INTEREST | TOTAL DAMAGES |
|---|---|---|---|---|
| 5409954 | $ 418,789.67 | $ 21,046.50 | $ 1,542.73 | $ 441,378.90 |
| 5414779 | $ 414,722.07 | $ 8,888.36 | $ 24,087.12 | $ 447,697.55 |

(Pl's 56.1 ¶ 40.) Thus, Plaintiff adequately establishes total damages of $3,034,066.70.

### D. Attorney's Fees and Costs

Plaintiff also requests reasonable attorney's fees and costs in the amount of $122,472.80 pursuant to the indemnification clause in the Purchase Agreement. (See Pl's Br. at 19.) For the reasons provided above, the Court finds that Plaintiff is entitled to an award of costs and reasonable attorney's fees. (See supra at 13.) Plaintiff's failure, however, "to attach billing records or receipts to its motion . . . warrant[s] denial of these categories of damages." Keybank Nat'l Ass'n v. Nour Limo, Inc., 345 F.R.D. 555, 564 (E.D.N.Y. 2024) (collecting cases). Accordingly, Plaintiff's request for attorney's fees and costs is denied without prejudice.

### IV. CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff is entitled to summary judgment on its First Claim for Breach of Contract and its Third Claim for Indemnification. Plaintiff is awarded $3,034,066.70 in damages. Plaintiff's request for attorney's fees and costs is DENIED WITHOUT PREJUDICE. The Clerk of the Court is respectfully directed to close this case.

**SO ORDERED.**
Dated: May 19, 2025
Central Islip, New York

/s/ (JMA)
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE